Judge Ewing

delivered the Opinion of the Court.
In 1791, James Norvell, a resident of Virginia, made his will, by which he bequeathed to his wife, Mary Norvell, all his slaves during her life, the remainder to his only son, William Norvell, and died shortly thereafter. William Norvell having become involved in debt, and being desirous to sell some of the slaves for the payment thereof, made an arrangement with his mother, by which he procured her to release to him her life estate, in a part of the slaves; in consideration whereof, he released to her his remainder, in the residue. After which they both removed to Tennessee; where, in 1823, she made a bill of sale of her portion of the slaves to her grandson, James Norvell, and took from him his obligation to maintain her comfortably during her life.
Shortly afterwards, her son William filed his bill against her and his son, J. J. Norvell, setting up claim to the slaves conveyed by the former to the latter. Before the termination of the suit, he died, and his second wife was appointed, his administratrix; and, after reviving the suit in her name, made a compromise with J. J. Norvell, by which, in consideration of one of the slaves conveyed to her, and the payment of some of the costs, she released to him the residue.
Mary Norvell, the widow, died in 1827. Shortly after which, to wit. on the 7th day of May, 1828, Thomas C. Norvell and Mary Moore, formerly Mary Norvell, with, her husband, Matthew Moore, exhibited their bill against James J. Norvell, at Rogersville, in the State of Tennessee, charging that said slaves were conveyed to the defendant, by Mary Norvell, intrust, to be divided between them and himself, and Clarinda Norvell, the four children of William Norvell, deceased, by his first wife, f hat Clarinda had died, and her interest had devolved o$ *373 ihe three as survivors. That he had sold several of the slaves, and was threatening to squander away the rest; and refused to execute the trust by making the division.
Upon their bill, an injunction was granted, restraining the sale or removal of the slaves; which issued on the 8th day of May, 1828, and was executed the 28th day of June following; and James J. Norvell filed his answer on the 4th of November, of the same year.
Pending the suit, and for reasons shown to the Chancellor, he issued a restraining order, prohibiting the removal of the slaves, and requiring James J. Norvell to execute bond with security, to have them forthcoming, and, in the event of his failure, requiring the sheriff to take them into his custody for safe keeping.
In contempt of the authority of the Chancellor and of his orders, James J. Norvell run the slaves across the line, into Kentucky, and left a part of them at the house of John Fletcher, in Knox county, and the others he put into a cabin on Yellow creek, in the neighborhood of Fletcher’s, but in Harlan county.
All the slaves that were run across the line, eventually, came into the possession of Fletcher, except Charles, who came into the possession of Isaac Sharp.
The complainants progressed with their suit, until the May Term, 1831; when, upon a full hearing of the cause, it was decreed, “that the complainants are entitled “to relief, and the allegations in the bill have been fully “sustained by the proof in the cause, and it also appearing to the satisfaction of the Court, that the negroes in “the complainants’ bill mentioned, were conveyed to “James J. Norvell by his grandmother, Mary Norvell, “on the express trust, that he would divide them equal“ly between himself, the complainants, and Clarinda Nor-“vell, deceased, qnd that the defendant, James J. Nor-“vell received them from her on said express trust;” it is decreed that the master take an account of the hire of the slaves, the maintenance of the younger ones, and of the grandmother, and of the costs and expenses of defending the suit brought by Wm. Norvell, and the value of those that were sold, &c. &g. under special instructions given. And it was decreed that Isaac Vanbiber be *374 appointed a commissioner to take said slaves into custody, and keep them until the final determination of the guit, “and all other matters and things are reserved until file coming in of the master’s report.”
The master having made report, and exceptions on account of two items thereof only, having been filed by the counsel of James J. Norvell—at the November Term, 1831, the exceptions were overruled by the Court, and the report received and affirmed, and the following decree made. “ It is. ordered, adjudged-and decreed, by the “Court, that the title t a the slaves in the complainants’ “bill mentioned, be divested out of the defendant, James, “and be vested in the complainants, according to the “prayer of their bill, in, the proportions therein mertion-“ed. And it appearing to the court, from the statements “of the parties made in open Court, that they have made “an agreement, in writing, by which the mode and man-“ner of dividing the property in dispute, has been adjusted by the parties, which supersedes the necessity of “appointing a commissioner to divide the same, and al“so the necessity of making a formal decree in the case, “it is ordered, that the defendant pay the costs, and that “the commissioner retain and sell Lucy Ann, the only “slave in his possession, to pay the costs”—who was subsequently sold for that purpose.
The commissioner’s report showed a balance, after all due credits, of thirty six dollars and one cent in favor of the defendant.
Immediately after the interlocutory decree. Thomas C. Norvell sold and transfered his interest in the negroes to Joseph Ferrel, and covenanted to use all lawful means to place the slaves in the hands of the commissioner. And, on the 11th of November, 1831, an agreement was made between the two Norvells and Ferrel, and reduced to writing, by which it was agreed that, the report of the Master should be confirmed, Lucy Ann surrendered up to J. J. Norvell, as his own, and the sales of three slaves, made before the suit was commenced, to Vanbiber, Hunt and Ferrel, be confirmed, without accountability on the part of J. J. Norvell for them, and one hundred and thirty dollars be paid to him, on account of his trip to Virginia, *375 in the defence of the suit with his father; and he to be entitled to the one third of the value of the slaves which are recited to have been sold or mortgaged to John Fletcher, except old Lucy, who is surrended up to J. J. Norvell, to be set free. And, to quiet the claim of Fletcher, it was agreed that the one hundred and thirty dollars might be paid to him, and if received it, and Thomas C. Norvell and Ferrel procured from him an acquittance to J. J. Norvell, for six hundred and ninety dollars, for which the slaves were mortgaged or sold to him, that should be in full of his third in those slaves in Fletcher’s possession. And if he refused to receive it, or to surrender the negroes, and suit would have to be prosecuted for them, and to receive the one hundred and thirty dollars only.
The bill, founded on the foregoing facts, to recover the slaves in controversy.
Answers; exhibits, and further facts relied on by defts.
On the 23d of May, 1831, Moore and wife sold and transferred their interest in the slaves to T. C. Norvell; and on the 17th of June, 1832, T. C. Norvell transferred the same to Joseph Ferrel.
Fletcher and Sharp, upon the proper demand by the commissionef and Ferrel, refusing to surrender the slaves for division—on the 9th of June, 1832, Ferrel filed his bill, in the Knox Circuit Court, against Fletcher and Sharp, based upon the foregoing facts; charging that Lucy, Betsey, Anna, Maria, Charity, and two children of Betsey and one child of Anna, whose names were unknown, were in the possession of Fletcher, and Charles was in the possession of Sharp; all of whom were embraced in the decree and compromise in Tennessee; and praying that the decree and compromise might be carried out and enforced, and the slaves surrendered up to him.
Fletcher answered, setting up claim to those in his possession, and controverting the complainant’s right to relief on various grounds, which will be noticed hereafter.
Sharp also answered, setting up claim to the one in his possession, and in like manner controverting the remedy sought; and each exhibited, with their answers, the evidences of their claim.
It appears by the exhibits, that Fletcher, on the 22d day of November, 1828, for two hundred and fifty dollars, *376 hired Maria from J. J. Norvell, for ninety nine years, and on the 2d of January, 1829, for one hundred and eighty dollars, hired Lucy and Charity for the same term, and, on the 18th of September, 1829, for three hundred dollars, took a bill of sale for Anna, executing his bond to Norvell, binding himself to permit her to be redeemed by a given day. And that Betsey and her child, Mary, were taken back to Tennessee, an execution levied upon her and her child, under which they were sold and purchased by Fletcher, for three hundred and fifty dollars; in the year 1829.
Decree of Pulaski Circuit Court, find appeal.
A purchase of property, made in this state, while there is a suit in which it is involved, pending in another State, must he treated as a pendente lite purchase—by virtue of the constitution of the U.S. and the act of Congress, which provide that full faith, credit and effect shall be given, in each state, to the public acts, records and judicial proceedings of every other state. So—
*376 Sharp also purchased up a claim in favor of one Williams, against J. J. Norvell, procured Charles to return to Tennessee; where a judgment had been recovered for the amount, when he was levied on, sold, and purchased by Sharp, for seven hundred and one dollars, in November, 1829.
At the October Term of the Pulaski Circuit Court (to which the cause had been removed by change of venue,) the Chancellor decreed to the complainant, two thirds in value of the slaves, as well as two thirds of their hire, after deducting from the hire, the price of raising the younger slaves; and also the one hundred and thirty dollars mentioned in the compromise agreement, which Ferrel was decreed to pay; and appointed commissioners to take an account, and divide and deliver over, to the complainant two thirds, and to Sharp one third, of Charles, and to Fletcher one third of those charged to be in his possession, and to make a report; and the cause was continued for further decree.
From this decree, the defendants have appealed to this Court.
It is obvious that the purchases of all the slaves were made during the pendency of the suit in Tennessee; but the purchases of most of them were made in Kentucky.
And the question arises whether those purchases, made in Kentucky, are affected by the pendency of the suit in Tennessee.
Whatever may be the doctrine applicable to purchases made in, and by citizens of, a distinct and independent *377 nation, from that in which the suit is depending, we cannot doubt, that within these United States, purchases in one state, pending a suit in another, must be treated as pendente lite purchases, and subjected to the rule applicable to such purchases. It is provided, in the Constitution of the United States, Article IV. Sec. 1, that, “full faith and credit shall be given, in each state, to the public acts, records, and judicial proceedings of every other state. And the Congress may, by general laws, prescribe the manner in which such acts, records and proceedings; shall be proved, and the effect thereof.” And, to carry out this provision of the constitution, the Congress of the United States, in 1790, after prescribing a mode of authentication, enacted that, “the said records and judicial proceedings, authenticated as aforesaid, shall have such faith and credit given to them in every court within the United States, as they have by law or usage, in the courts of the state from whence the said records are or shall be taken.” 1 Statute Law, 30, 189-90.
Held that, where a suit to recover certain slaves, was instituted in a court in chancery in Tennessee, which had jurisdiction of the subject matter, & in which the parties were duly bro’t before the court, by personal service of its process, and a decree was finally obtained, binding upon the parties and their privies—that decree (if fairly obtained,) is equally binding and conclusive on a purchaser of some of the slaves, which had been brought over into Kentucky, and sold to him here, while the suit was pending in Tennessee.
Under these provisions of the Constitution and statute it has been settled that, in each state, the records and judicial proceedings of any other state are to have the same credit, validity and effect, as they should have, by law or usage, in the state of their origin. Mills vs Duryee, 7 Cranch, 481; Hampton vs McConnel, 3 Wheaton, 234; Field vs Gibbs, 1 Peters, 155 and 78; Rogers vs Coleman, Hardin; 413, 1 Littell, 417 and 273; Bissel vs Briggs, 9 Massachusetts Rep. 462; Williams vs Preston, 3 J. J. Marsh. 604.
The proceeding in Tennessee was a “judicial proceeding, ” which was prosecuted with due diligence, to a decree, and which, by the well established principles of the common law, had, in that State, validity and effect, and conclusive operation, not only upon parties and privies, but also, upon pendente lite purchasers. If so, the Court having jurisdiction of the cause, and process personally served on the defendant, and the subject matter of controversy being within the jurisdiction of the Court, a decree thus obtained; must have the same force and effect and conclusive operation in Kentucky, upon the same rights and same class of individuals. To give to it conc *378 lusive effect upon parties and privies, and not upon pendente lite purchasers, would no more be giving to it the same conclusive validity and effect in this State, that it has in Tennessee, than if its validity and effect were allowed to operate upon parties only, and not upon primes. Comity between the states, the letter of the constitution and act, as well as the spirit and the policy which dictated their adoption, require that the same conclusive credit and effect should be given to it, in each of the states, upon the rights of all persons, and oil the matters involved in the litigation. If the slaves in contest were now in Tennessee, it could not be doubted that the decree, if free from extraneous objections effecting its validity, could be carried out and enforced against pendente lite purchasers, as well as parties or privies. If so, the same force and effect should be given to it here.
The levy of an ex’on on slaves while they are the subject of a suit in chancery, is irregular; a sale under the ex’on will not defeat the effect of the decree.
A suit in ch. was instituted in Ten. in which, in due time, it was decided and decreed that the compts. were entitled to the interest in certain slaves for the recovery of which their bill was filed; a commissioner was appointed to ascertain the amount of hire, also to be recovered, the cost of raising certain young ones, &c.—whose report was subsequently made and confirmed; and a further order was made, directing him to take possession of, & divide, the slaves &c. Afterwards, an order of court was entered of record, stating that, it appeared by the statement of the parties, in open, court, that they had agreed, in writing, upon the mode and manner of dividing the property; which made any formal decree on the subject unnecessary; and that deft. pay the costs, &c.— Held that, tho’ the final division of the slaves (if they were divided) was made by the agreement of the parties, and not by the decree of the court: yet as the previous interlocutory decree settled their lights, and was never changed,it is conclusive on them and their privies; and, also, upon lis pendens purchasers who purchased the subject of the suit in Ken.—unless they have been injured by the fraud of their vendor in collusion with other parties to the compromise.
*378 As to the slaves purchased under execution, it is clear that, after the Chancellor’s jurisdiction in Tennessee had attached, that the levy and sale under execution, of any of the slaves in controversy, were wholly irregular, and could in nowise defeat the effect of the decree afterwards rendered. Consequently, the levy and sale of Charles and Betsey and child being made after jurisdiction had attached, can confer no right on the purchasers, Sharp and Fletcher, which can be availing against the decree.
But it is contended that the decree of May, 1831, was interlocutory only, and that of November following was based upon the compromise agreement, entered into between the complainants and the defendant, without the privity of Fletcher or Sharp, and in fraud of their rights; and should not, therefore, be enforced against them, as pendente lite purchasers.
If the grounds relied on, be not available in Tennessee, against its enforcement, neither should it be permitted to avail here.
The first decree, upon a full hearing of the cause upon the merits, distinctly expresses the opinion of the Court in favor of the complainant’s right to a division of the slaves, according to the prayer of their bill. Though that decree be admitted to be interlocutory, it was not changed, but affirmed, at the subsequent term; nor is there any *379 reason to conclude, that it would have been changed had no compromise been made. Nor does it appear that that portion of the subsequent decree which affirmed the rights of the complainants in the slaves, and vested the title in them, according to the prayer of their bill, was based upon the compromise agreement, or that the agreement was ever seen by the Court. Indeed, the decree goes beyond the agreement, and following out the interlocutory decree, vests in the complainants each, in substance, a title to one third of all the slaves in the bill mentioned, when, by the agreement, they had surrendered up to the defendant their interest in those that had been sold before the commencement of the suit.
The Court learning, not by an exhibition of the agreement, but, by the “statement of the parties made in open court, that the parties had agreed to the mode and manner of dividing the property in dispute,” fails to carry out and enforce the division, leaving that to be accomplished by the parties themselves. That is, the Court makes a final decree upon the right and title, hut fails to divide the slaves.
The decree is, therefore, conclusive upon the parties, as to the right and title, and cannot be rendered less so, because the Court stopped short, and failed or refused to divide the slaves upon the ground that the parties themselves had agreed upon the mode of division.
It is also conclusive upon the rights of pendente lite purchasers, unless they have been injured by the fraud of their vendor, acting in collusion with the complainants. No such fraud appears; nor does it appear that their rights have been injuriously affected by the agreement; but so far from it, the agreement redounds to their benefit; for Fletcher is secured in the reception of one hundred and thirty dollars, over and above the one. third of the slaves in his possession. And the Chancellor might have set apart those slaves that had been sold before the commencement of the suit, to the share of the defendant, and an equivalent, in value, out of those, that were sold pendente lite, to each of the complainants, which would have greatly lessened the amount of Fletcher’s and Sharp’s interest in the slaves in contest,
Where property has been bro’t in to this state, from another State, while a suit was there pending up on the right to it, and which has been there determined, a court in any county here in which the property, or any part of it, & any proper deft. are found, may take jurisdiction to carry out and complete the object of the foreign suit; and may bring before it, all other necessary parties.
Any tenant in common has a right to the possession of the property; and if others, having equal rights, are excluded, a bill in chy. for a division, is the appropriate remedy
A decree of a c’t of competent jurisdiction in Ten. is entitled to the same effect here, that it wo’d have there: no more; and any objection that would, present the enforcement of a decree rendered here, will apply with like force and effect to one rendered in Tennes. which is sought to be enforced here.
The claim or right to personal property in the adverse possession of another, is but a choose in action, and no sale or transfer of property in that condition, will pass the legal title to it; such a right can be enforced only in a court of eq. if at all. And tho’ in modern times, an assignment of a chose in action is viewed in equity, as the declaration of a trust, the assignee as the cestui que use, who is permitted to assert, in his own name, as assignee, any claim or demand, arising by contract, for money or property—query, whether a court of eq. would interpose in behalf of a purchaser of property which, at the time of the purchase, was held adversely to the vendor.
*380 We are also satisfied, that a court of equity here, may take jurisdiction of the cause, in the appropriate county, to carry out and enforce the decree in Tennessee; arid that jurisdiction was properly taken in Knox, where a part of the slaves and one of the defendants were found; and it was proper to bring all persons who had become interested in the slaves which were subject to the decree in Tennessee, before the Court.
Had the decree there, been rendered in Kentucky, it is abundantly established that an original bill would lie to carry out and enforce it. Nor can it be questioned that an original bill in equity would lie in Tennessee, to carry out and enforce-the decree, in case the slaves were within the jurisdiction and subject to. the control of the Court there. Giving to the Tennessee decree the same force and conclusive effect of a decree in Kentucky, or that full faith and conclusive effect which would be given to it there, we can perceive no just reason for withholding the same remedy here, to enforce it. Besides, Flete her and Sharp having, by their purchase, acquired the interest, or one third, of J. J. Norvell, became tenants in common with the owners of the other two thirds, and had a right to the possession ; and the bill in chancery for a division, was the appropriate remedy; and Sharp and Fletcher being interested in the division were properly brought before the Court.
But though the decree, as a decree of Tennessee, must have the same force and effect allowed to it as if rendered in Kentucky; and that a court of equity here may take jurisdiction to enforce it; yet there is a radical ground of objection to the enforcement of the decree in behalf of the equity set up by the complainant, which, as a decree of Kentucky, would present an insuperable objection to its enforcement, or to the aid which the complainant seeks, upon it.
Fletcher and Sharp were in the adverse, possession of the slaves in contest, as well when Thomas C. Norvell purchased from Moore, and wife, as when he sold and transferred his interest to the complainant. The right of Moore and wife, as well as of Norvell, was a chose in action only, or right to personal property claimed ad- *381 Tersely by another. Property thus conditioned is "not vendible or assignable legally: and if sold or assigned, vests no legal title in the purchaser. The purity of the common law restricted the assignment of a chose in action, or sale of property in the adverse possession of another, as tending to champerty and maintenance, the increase of litigation, and the oppression of the weak. And though, in modern times, for the benefit of trade and the advancement of commerce, those salutary rules of the common law have been greatly relaxed, they have never been so far relaxed as to permit a sale thus made to transfer the legal title to the purchaser, or to permit him to maintain a suit upon it in his own name, as a legal title. If the complainant, therefore, has acquired any title by his purchase, it is a mere equity, which can be enforced only, in his own name, in a court of equity, if it be conceded that it may be enforced there, which is not clearly settled. For though it is laid down broadly, in some of the elementary books, that courts of equity disregard this rule of the common law, and will take cognizance and enforce the assignee’s equity of a chose in action—treating him as cestui que use, and the assignment as a declaration of trust (1 Maddock’s Chy. 545-6; Story’s Equity, 2nd vol. 306, to 313,) and though this is well established with respect to any debt, claim, or demand, for money or property, arising upon contract; yet, it is not clearly established by authority, that chancery would interpose in behalf of a vendee of personal property whose purchase was made when the adverse possession was in another.
If such a claim, may be enforced where, as in this case, the purchase was made after the vendor’s right had been established by a judicial decision, and he, being a party, makes no objection—still,’ if the claim of the purchaser was tainted in its origin, with fraud, inquity or champerty, he cannot have the aid of a chancellor to enforce it. So—
Where a suit was instituted in Ten. and the slaves which were the subject of the controversy, were removed to this State, by one of the parties, pending the controversy, and were afterwards sold to a purchaser here, who instituted a suit, to carry out and enforce the decision and decree obtained in Tennessee, and, by proof of numerous facts and circumstances, it was made evident, that the Tennessee suit was commenced under a champertous agreement with the purchaser here and another, and carried on by their maintenance; that they themselves were the principal witnesses, and that the decree could not have been obtained without their testimony—the truth of which was very questionable—held that, the chancellor should neither aid nor countenance the complainant or his claim, but should dismiss the bill.
But, if it be conceded that a court of chancery may take jurisdiction in this case, in behalf of the complainant, as purchaser, upon the ground that his purchase was made after the interlocutory decree determining the right *382 in favor of his vendor, and his vendor is before the Court as defendant, not objecting, but giving sanction to the right and to the decree sought by the complainant, and when the proceeding in chancery is the appropriate remedy, independent of the assignment, to enforce the decree of Tennessee, and cause a division of the slaves; yet, the right of the complainant is a mere equitable right, and if tainted with iniquity, fraud, or champerty, in its origin, will not receive the aid or countenance of a Chancellor in its enforcement.
The proof in the cause tends strongly to the conclusion—indeed, it is rendered reasonably certain, that the sale and assignment to the complainant, was the consummation of a previous secret champertous understanding between the complainant, one Vanbiber and Thos. C. Norvell, by which the suit in Tennessee was instigated, commenced and carried on, by the aid and assistance of the two former, for part or profit out of the matters in contest, and in which they both were made witnesses in support of the claim set up and asserted by T. C. Norvell and Moore and wife, and gave important testimony in the cause, and without whose testimony there is scarcely a shadow of ground left upon which to rest a decree in favor of the complainants in the suit, against the strong countervailing proofs in the cause, backed by an absolute bill of sale, in writing, unimpeached by the slightest proof of fraud or mistake in its execution, or allegation to that effect. Indeed, without such bill of sale, independent of the testimony of Ferrel and Vanbiber, the evidence is deemed entirely insufficient to sustain the decree. Nor can it be believed that, the decree ever would have been obtained, but for their testimony. If these things be true, then the decree which is sought now to be enforced in a court of equity here, was procured by the testimony of two champertors and maintainers, who were interested in the result, and the equitable assignment sought to be sustained, enforced and made available, by a court of chancery here, was the fruits of, and had its origin, in, iniquity, fraud and champerty, if not in a grosser crime, by which right and truth was suppressed, and public justice perverted.
*383 We will not stop to enumerate all the circumstances which lead to the conclusion intimated, but will refer to some of them.
It is proven that Thomas C. Norvell, before the institution of the suit, set up no claim to the slaves, and said that he had no interest in them. It is also proven by a witness who stands unimpeached, that before or about the time of the institution of the suit, the witness was riding in company with Ferrel, near a tract of land owned by the latter, and Ferrel pointed to the land and said that, “Thomas C. Norvell would own that land in a short time. ” The witness knowing the inability of Norvell to pay for it, asked how he could own it, and Ferrel replied that “ if Norvell would do as he directed him, he would put him in the way to get some kinkey or nappy heads and the witness understood him as alluding to the slaves afterwards sued for and recovered; and Norvell did afterwards get the very land.
It is proven by another witness, that Ferrel and Vanbiber both went with Norvell to the lawyer who brought the suit, counselled with him in respect to its institution, and became bound with Norvell for his fee; and it is proven, they both took an active interest in its prosecution; and Ferrel furnished Norvell with a horse, at different times, to ride to court, and money to pay his expenses. It is also proven by another witriess, the brother-in-law of Ferrel, that Ferrel had told him, in the progress of the suit, and before the interlocutory decree, that he and Vanbiber were partners with Norvell in the suit, and if it had not been for them it never would have beeri brought. And also, by another witness, that Ferrel said that he and Vanbiber were to do all they cOuld in the suit, and make all the proof they could.
Ferrel, besides an active agency in other respects, in the suit, on the side of Norvell, aided him in propounding questions to a witness, at least on one occasion, and stated to another witness, that, though he had no interest in the suit at its commencement, that since Thomas had made such strong proof, he intended to have a hand in it. And various other witnesses prove the confessions of Ferrel, pointing to the fact of his and Vanbiber’s interest in *384 the suit. It is also proven that when one of the family of slaves in contest, which was in possession of Ferrel, was levied on by a constable, that T. C. Norvell said the constable had done wrong, as he did not know but that the slave so levied on, might fall to Vanbiber, in the division of the slaves: And by another witness; that he said, on another occasion, he could prove any thing he wanted to prove, by Ferrel and Vanbiber, and that he had done so in the suit. And is is proven that one of them said that he would as soon step into court and swear to a lie as not.
It also appears that immediately upon the rendition of the interlocutory decree, the slaves are transferred to Ferrel, at a reduced nominal price, and Norvell gets the very land he was to get, if he pursued the advice of the former. It also appears, that Vanbiber is thrust forward, or thrusts himself forward, as commissioner, to demand and take possession of the slaves, under the interlocutory decree; that he goes all the way to Kentucky to demand the slaves from Fletcher; was to become the surety of Ferrel for the performance of the compromise agreement with Fletcher, and has his deposition taken several times, or it is taken several times, in the progress of the suit in Tennessee, as well as in Kentucky; and in many other respects, manifests a strong interest, and takes an active part in those suits, in behalf of the claim of the bomplainants. And, in addition to these circumstances, witnesses are examined going strongly to impeach the standing of both Vanbiber and Ferrel, and to discredit them as witnesses, on the ground of a want of good character.
These circumstances tend strongly to the conclusion that, the equity of the complainant originated in fraud, collusion, maintenance and champerty, if not in corrupt perjury, and ought not to receive the countenance and aid of a court of equity in its enforcement.
If it were admitted that, they would not be sufficient to uproot the decree of Tennessee, at the instance and upon the application of J. J. Norvell, and those claiming under him, as complainants in a bill of review, or bill in the nature of a bill of review for fraud, champerty and *385 corruption, we cannot doubt that they are sufficient to rebut the equity set up by Ferrel, as complainant.
He who seeks equity must not have been guilty of iniquity. He must present himself in a court of conscience with clean hands.
And if we are mistaken in the conclusions to which we have arrived upon the testimony, the proofs and circumstances are such, at least, as to cast around, the equity asserted by the complainant, a dark cloud of suspicion, which should induce the Chancellor to stay his hand, and refuse his aid in its effectuation or enforcement.
It is, therefore, the opinion of the Court, that the decree of the Circuit Court be reversed, and cause remanded, that the bill may be dismissed; and the appellants are entitled to their costs in this court.