A. TYLER & Co. *vs.* WILLIAM DUNTON & others.

October Term, 1873.

EXECUTION—LEVIES BY DIFFERENT OFFICERS.—Where a constable has seized property by the levy of a justice's execution, the sheriff may, by agreement with the constable, make a valid levy of a court execution against the common debtor on the same property, in subordination to the first.

*Jno. Lellyett*, for complainants.

*N. D. Malone*, for defendants.

THE CHANCELLOR:—On the 31st of May, 1871, Jones, a constable, levied two executions upon judgments rendered by a justice of the peace against the defendant, William Dunton, on a stock of groceries, the property of Dunton. On the same day, Stull and Morgan, two other constables, with the consent of Jones, levied other justices' executions on the same property, but the judgments, on which these latter executions issued, were afterwards set aside as void and the levies abandoned. On the same day, also, and while Jones, Stull and Morgan were taking stock of the goods levied on, L. L. Losey, as deputy sheriff, came to Dunton's store-house where the goods were, with an execution from the circuit court in favor of R. B. Cheatham & Co., against Dunton, and, upon inquiry, being informed of the previous levies, and taking a memorandum of the amount, he said to the constables and to the debtor then present, that he levied the execution upon the goods, "subject to the former levies." To this no objection was made. He did not lay his hands upon any of the goods, or take possession of them. It does not appear that Jones, who made the first levy, said anything when Losey announced that he had made a levy subject to the previous levies. Dunton, the judgment-debtor, testifies in his deposition that "when Losey started to go out, he said to Jones in substance, "'I suppose you will let me have what there is left?'" "I don't remember," adds the witness, "that Jones said anything in reply," nor is he certain that Morgan and Stull said anything, but if they did, they said "all right," or something to that effect. Losey returned

the execution levied on the stock of goods subject to the levies made by Jones, having doubtless learned before writing out his return that the Morgan and Stull executions were void.

On the 2d of June, 1871, the complainant, A. Tyler & Co., recovered judgments against Dunton before a justice, and caused executions to issue, which were returned *nulla bona*, and on the same day they filed their bill, setting out the levies by Jones, and insisting that after such levy, the property was not subject to another levy of an execution at law; that the execution-debtor had only an equity in the goods so levied on, which could not be reached except in this court. He insisted that the levy of the Cheatham execution was invalid for this reason, and was, moreover, insufficient in any event for want of being made as the law requires.

It seems that the goods in controversy were sold under the orders of the court in this cause, Jones' executions satisfied, and the controversy is now over the surplus between complainants and Cheatham & Co.

At the hearing of the cause, it struck me as very clear that the levy of Cheatham's execution was good, and gave the defendants the better right, and I so decided, perhaps too promptly. At the solicitation of the complainants' counsel, however, I consented to receive additional briefs, and take the case under advisement. The new arguments embody the result of much labor on both sides, and are ably prepared. The authorities cited are, however, not directly in point, nor overwhelmingly conclusive either way. Singularly enough the precise question does not seem ever to have been positively ruled, and, after all, the decision must turn upon general principles, and reasoning from analogy. But the complainant's counsel has succeeded in convincing me that the point is not so clear as I supposed, and is, on the contrary, one of great doubt.

Before proceeding to discuss it, one or two preliminary matters should be disposed of. At the hearing, the defendants, Cheatham & Co., had not filed a certified transcript of

their judgment, which the complainants insisted was a fatal omission. I did not think so at the time, nor do I now in view of the pleadings, the bill raising no issue upon the existence of the judgment, and only disputing the validity of the levy of the execution. The defendants, however, that the case might not go off upon this technical objection, afterwards produced a transcript of the judgment, and asked leave to file it, which I permitted to be done. Thereupon, the complainants renewed a motion, supported by affidavit, which had previously been made when the cause was still on the rule docket, and disallowed by the court, but of which no entry was made on the minutes, to file an amended bill alleging that Losey, who made the levy of the Cheatham execution, was not at the time a deputy sheriff, but was assuming to act without authority. The facts upon which this averment is sought to be rested, are that the deputation in writing on the execution, as well as the signature of the sheriff thereto, is in Losey's own handwriting; that the sheriff has admitted the fact that the deputation was written by Losey and not by him, and therefore the complainants charge that it was done without the authority of the sheriff. But the affidavit and amended bill are fatally defective in not going further and showing that the deputation was not recognized, ratified and confirmed by the sheriff. Such a ratification, it is clear, would be equally as efficacious as a previous authority. Public policy requires that the acts of the sheriff's deputies should be sustained as between individuals, no matter how informal the authority may have been, if, in fact, there was authority, either in advance or by subsequent ratification. *State* v. *Allen*, 5 Ire. Law, 36. The motion to file the amended bill is disallowed.

At common law, the levy of an execution vested the officer with a title and right to possession, which he could maintain against the defendant in the execution and all third persons. The title thus acquired was, of course, not absolute, but only for the purpose of satisfying the execution debt. If the debt were paid, the title and right of possession reverted instanter

to the execution-debtor, without any conveyance from the sheriff. So, as between the execution-creditor and the execution debtor, if the property after levy was restored to the defendant, or came to his possession and was used by him, there was no satisfaction of the judgment-debt. So, if the property sold for more than enough to pay the execution-debt, the surplus was the property of the execution-debtor, and might be reached by his creditors by garnishment or otherwise. These common law principles have all been recognized in this state.

These general principles, particularly in so far as they elucidate the *title* of the sheriff acquired by the levy and the interest remaining in the debtor, have been most clearly brought out in some of the North Carolina cases. In *Popelston* v. *Skinner*, 4 Dev. & Bat. Law, 156, 158, Ruffin, C. J., says: "It is true that it is said, when a sheriff seizes goods, the property is changed. A seizure to the value of the debt, *prima facie* satisfies it and discharges the debtor; and therefore the defendant loses the property and it vests in the sheriff. But if the sheriff seizes less than the value, the debt on the one hand is not paid; and if he seizes more than the value, the property, on the other hand, does not belong absolutely to the sheriff. The general proposition, then, that the property in goods taken in execution is in the sheriff, must be understood with qualifications. The law gives him the property to enable him to raise the money he is commanded to make; and the property is given, as far as it is necessary for that purpose, but no further. As far as it is vested in the sheriff, it is divested out of the defendant; but of course, no farther. This interest in the sheriff is called the special property; that is to say, such a right and possession as is deemed necessary to the special purpose of satisfying the execution debt; which enables the sheriff to make a sale of it, to defend his possession, and to bring an action against one who disturbs his possession before the execution has been satisfied. But it results from the very term 'special property,' that, subject to the raising of the debt, the *general*

*property is in the former owner.* Every case of bailment gives rise to a similar division of property, if the expression may be allowed." * * * "The interest of the sheriff is therefore limited by the purpose for which it was created, which is the creditor's satisfaction. Beyond that, the sheriff holds for the original owner ; whose interest is, therefore, obviously a valuable present property, the subject of sale and conveyance." In *Alexander* v *Springs*, 5 Ire. Law, 479, the language of the same eminent judge is : "After a seizure the sheriff gains but a special property, such as is necessary for the satisfaction of the debt, and leaves in the original owner the general property, which is an interest he may sell and convey at law." In this last case there was a sheriff's levy and a constable's levy on the same property, and a joint sale made by them ; but, after the levy made by the sheriff and before the levy by the constable, the debtor sold the property, and it was held that the vendee took a title superior to the constable, under his subsequent levy. No intimation is given by the court that the two levies might not stand and the sale pass a good title, nothing else being in the way.

The actual decisions of our supreme court are in strict accord with these common law principles, although the language of learned judges in delivering the opinions of the court is not always equally harmonious. The tendency in the earlier decisions in the Yergers was to exaggerate the title of the sheriff with a view to relieve the sureties of the principal debtor, and this tendency shows its traces in some of the later decisions. Thus in *Brown* v. *Allen*, 3 Head, 429, the only question before the court was whether a levy on a slave worth far more than the execution debt, and leaving the slave in the possession of the execution-debtor, would vitiate the levy, so that the constable could not recover the property from a purchaser from the execution-debtor *to the extent of the debt levied*, and the decision was in favor of the levy. The action was replevin by the purchaser against the constable, and the latter recovered the value of the slave *but released all of the verdict except the execution-debt levied*. The

learned judge who delivers the opinion does say, that the execution-debtor could communicate no title to a third person "until the (execution) debt was paid or the levy in some way waived or abandoned." This is undoubtedly correct to the extent of the execution-debt, and that was what the learned judge had in his mind, for nothing else was in controversy in the case.

In *Bradley* v. *Kesee*, 5 Cold. 223, the property in controversy, a stock of goods, had been levied on by the sheriff with a court execution. Afterwards constables, holding magistrates' executions, pretended to have levied on the same goods subject to the sheriff's levy, "back levied after the sheriff," to quote the language of the report, and on the faith of such levies had taken from the execution-debtor bond with security for the delivery of the property. Upon bill filed by the sureties on these bonds, the court held, as a matter of fact, that the constables had never actually levied their executions, and that the bonds were obtained wrongfully. The learned special judge who delivers the opinion of the court, does say, *arguendo:* "All the personal property being under levy was *in custodia legis*, and no other officer had any right to seize and receive the same," citing 1 Swan, 426 ; 10 Pet. 400 ; 5 Mass. 271 ; 9 Dana, 378 ; 4 B. Mon. 241.

The general principle thus enunciated is undoubtedly correct. When a ministerial officer has under legal process seized and taken possession of personal property, no other officer, especially one acting under a different jurisdiction, has the right to seize the property and take it out of the possession of the first taker *in invitum*. There is no conflict of authority on this point.

So, I think, it may be conceded to be good law, as was held in *Darnaby* v. *Rodgers*, 4 B. Mon. 241, that an officer is not bound to levy upon property already levied on by a valid execution. For the law makes it the duty of the levying officer to levy upon only so much property as will be sufficient to satisfy his execution, and it cannot be held to be the duty of another officer to do that which implies a viola-

tion of duty by his predecessor. Whether it would be otherwise in a gross case of excessive levy, to which the officer's attention is called, need not be considered. So, it may well be held to be the duty ordinarily of an officer having an execution against two or more persons, if he finds the property of one of them levied on, to proceed against the others, without pausing to see whether any surplus may remain from the previous levies. For, the officer's duty is to make the money as speedily as he can, and he is not to be delayed by the chance of a surplus in the case supposed.

But suppose none of these contingencies are in the case, and the second officer can find no other property to levy on, and goes to the officer who has made the first levy, and says I concede your prior right to be first satisfied out of the property you have levied on, and intend to leave the property entirely in your control and subject to your right, and only ask permission to levy my execution on any excess of the defendant's property which may remain after satisfying your debt, and the other officer expressly or tacitly consents. Is there anything to prevent such a levy from being made? or is such a levy absolutely void? The argument of the complainants' counsel is that such a levy is invalid. The reasons assigned in support of the argument are in form several, but when analyzed are narrowed down to two :

1. To make a valid levy of personalty, there must be an actual seizure or reduction into possession by the officer, but this cannot be done where the property is already in *custodia legis* by a previous levy.

2. The title to the property levied on is so vested in the officer that all that remains to the execution-debtor is an equity which cannot be reached at law, but must be subjected by a bill in chancery.

As to the first of these positions, it is well settled that manual caption is not necessary to the validity of a levy. All that the law requires is that the property be near, or in view, and subject to the control of the officer. *Etheridge* v. *Edwards*, 1 Swan, 426 ; 1 Sneed, 180. So, also it is equally

well settled that the sheriff may leave the property in the possession of a third person as his agent, or in the possession of the execution debtor himself. *Brown* v. *Allen* 3 Head, 429 ; 1 Swan 426. If now an officer who has levied on property consents to a subsequent levy to the extent of the debtor's interest in the surplus, and the property is left in his possession, he agreeing to hold the surplus as the agent of the second officer, every requirement of the law insisted upon is met, and the levy must, consequently, so far as this ground is concerned, be valid.

The other position, that the interest of the debtor in property levied on is a mere equity, is in conflict with the principles of the common law as hereinbefore set out, and with the direct decisions on the point already quoted. They all go upon the idea that the title of the debtor is a legal title, subject only to the "special title" of the officer as a bailee for a special purpose. In *Popelston* v. *Skinner*, 3 Dev. & Bat. Law, 156 and *Alexander* v. *Springs*, 5 Ire. Law, 479, the property sued for was purchased from the execution debtor while actually under the levy of execution, and yet it was held in both cases that the purchaser acquired the legal title, and, in the one, he recovered the whole property, the execution levied having been otherwise paid off, and in the other he recovered so much of the property as was covered by the constable's levy, the whole property, it will be remembered, having been sold jointly by the sheriff and constable under their levies. It must be so, on principle, for the sheriff only acquires his "special title" in so much of the property as may be necessary to satisfy his debt. The surplus, if any, is the property of the debtor beyond all question. And even as to the property necessary to pay the debt, if the lien be removed, or the "special title" lost for any reason, the ownership of the debtor is as if it had never been interfered with.

It would seem, therefore, in the case supposed, of agreement between the officers themselves, that there is no difficulty in sustaining a second or third levy upon the back of,

and subordinate to the first. And this is, in effect, conceded by the court in *Darnaby* v. *Rodgers*, 4 B. Mon. 241, the strongest case which the complainants' counsel has found in support of his views, for they say : " A conventional arrangement between the old sheriff and the new, might be made in a case like this for the benefit of the junior execution, but *stricti juris*, we think the new sheriff had no right to interfere without the consent of the old."

Such an agreement need not be express. It may be implied from circumstances. And I think the evidence in this case does sufficiently establish that there was a levy of the execution of Cheatham & Co. on Dunton's interest in the surplus goods, and that the levy was acquiesced in by the constables who had made the previous levies.

The costs will be paid out of the funds in court, and the surplus applied first to the payment of the execution of Cheatham & Co.

NOTE.—This case, upon appeal, was affirmed in its law, but reversed upon the facts, the court being of opinion that the evidence did not sufficiently show that the constable who made the first levy consented to the levy of the sheriff on the surplus.